**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| SHERIN EASTERDAY,<br><br>Plaintiff,<br>vs.<br>WHIRLPOOL CORPORATION,<br><br>Defendant. | No. 19-CV-20-LRR<br><br>**ORDER** |

_____

*I.    INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*2*

*II.   RELEVANT PROCEDURAL HISTORY.* . . . . . . . . . . . . . . . . . . . .*2*

*III.  SUBJECT MATTER JURISDICTION.* . . . . . . . . . . . . . . . . . . . . .*2*

*IV.   SUMMARY JUDGMENT STANDARD.* . . . . . . . . . . . . . . . . . . . .*4*

*V.    RELEVANT FACTUAL BACKGROUND.* . . . . . . . . . . . . . . . . . . .*5*

    *A.    The PIC Group, Inc..* . . . . . . . . . . . . . . . . . . . . . . . . . .*5*
    *B.    Easterday's employment with PIC.* . . . . . . . . . . . . . . . . . .*6*
    *C.    Rick Raue's employment with Whirlpool* . . . . . . . . . . . . . .*6*
    *D.    Easterday's resignation.* . . . . . . . . . . . . . . . . . . . . . . . .*7*
    *E.    Raue's alleged harassment of Easterday.* . . . . . . . . . . . . . .*8*
    *F.    Other allegations of prior incidents involving Raue.* . . . . . . . . .*9*
    *G.    Raue was not Easterday's supervisor.* . . . . . . . . . . . . . . . *10*

*VI.   ANALYSIS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

    *A.    Parties' Arguments.* . . . . . . . . . . . . . . . . . . . . . . . . . *11*
    *B.    The Parties Have Identified No Issues of Material Fact.* . . . . . . . *11*

*VII.  CONCLUSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*

## I. INTRODUCTION

The matter before the court is Defendant Whirlpool Corporation's ("Whirlpool") "Motion for Summary Judgment" ("Motion") (docket no. 30).

## II. RELEVANT PROCEDURAL HISTORY

On January 15, 2019, Plaintiff Sherin Easterday filed a "Petition at Law" ("Petition") (docket no. 4) in the Iowa District Court for Linn County. In the Petition, Easterday alleges one count of sexual harassment in violation of the Iowa Civil Rights Act ("ICRA"), Iowa Code section 216.6. *See generally* Petition at ¶¶ 1-4. On February 15, 2019, Whirlpool filed a Notice of Removal (docket no. 1), bringing the case before this court. On February 18, 2019, Whirlpool filed an Answer and Affirmative Defenses (docket no. 2).

On January 10, 2020, Whirlpool filed the Motion. On February 7, 2020, Easterday filed the Resistance (docket no. 33). On February 14, 2020, Whirlpool filed the Reply (docket no. 34). Neither party has requested oral argument, and the court finds that oral argument is unnecessary. The matter is fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

"Federal courts are courts of limited jurisdiction. The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Kessler v. Nat'l Enter., Inc.*, 347 F.3d 1076, 1081 (8th Cir. 2003) (quoting *Godfrey v. Pulitzer Pub. Co.*, 161 F.3d 1137, 1141 (8th Cir. 1998)). Even if the parties do not dispute the existence of subject-matter jurisdiction, a court may not preside over a case without it. *See Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 (8th Cir. 2001) ("It is axiomatic that a court may not proceed at all in a case unless it has jurisdiction.").

An individual's citizenship "is determined by a person's physical presence in a state along with his [or her] intent to remain there indefinitely." *Altimore v. Mount Mercy*

*College*, 420 F.3d 763, 768 (8th Cir. 2005). Easterday resides in Cedar Rapids, Linn County, Iowa. Petition ¶ 1; Notice of Removal ¶ 9. There is evidence in the record that she intends to remain in Iowa indefinitely. In 2017, Easterday listed her Iowa address on her Iowa Civil Rights Commission Complaint Form. *See* Whirlpool's Appendix in Support of Motion for Summary Judgment ("Whirlpool's Appendix") (docket no. 30-4) at 14. Similarly, in 2018, The Iowa Civil Rights Commission corresponded with Easterday at her Iowa address. *See id*. at 5. Further, in 2019, Easterday met with her family care physician, Dr. Katherine Alatorre, in Cedar Rapids, Iowa, where Easterday resides. *See* Easterday's Appendix in Support of Resistance to Defenant's Motion for Summary Judgment ("Easterday's Appendix") (docket no. 33-4) at 154; see also id. at 163 (providing that Easterday began outpatient therapy treatment with Kaitlin Gudenkauf in Cedar Rapids, Iowa). Based on the foregoing, the court concludes that Easterday is a citizen of Iowa.

Pursuant to 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business[.]" *Id*. Whirlpool is a Delaware corporation with its principal place of business in Benton Harbor, Michigan. Petition ¶ 2; Notice of Removal ¶ 10.

Additionally, the amount in controversy exceeds $75,000. *See* Notice of Removal ¶¶ 28-37.

Accordingly, the court has diversity jurisdiction over the claims because complete diversity exists between the parties and the amount in controversy exceeds $75,000. *See* U.S.C. § 1332(a)(1) ("The district courts have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States.").

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show'" an absence of a genuine dispute as to a material fact. *Hilde v. City of Eveleth*, 777 F.3d 998, 1003 (8th Cir. 2015) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157 (8th Cir. 2016) (quoting *Gazal v. Boehringer Ingelheim Pharm., Inc.*, 647 F.3d 833, 837-38 (8th Cir. 2011)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant has done so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

On a motion for summary judgment, the court must view the facts "in the light most favorable to the nonmoving party." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts. . . .'"

*Torgerson*, 643 F.3d at 1042 (quoting *Matsushita*, 475 U.S. at 586). Instead, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018) (third alteration in original) (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011)). Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010). "Evidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis Cty.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving party, and affording her all reasonable inferences, the uncontested material facts are as follows.

### A. The PIC Group, Inc.

The PIC Group, Inc. ("PIC") is a quality assurance company that is hired by manufacturing companies to inspect and/or rework finished products before they are sent out for sale. "Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment" ("SUMF") (docket no. 30-2) ¶ 5. During the time period relevant to this case, PIC provided quality assurance services to Whirlpool at Whirlpool's Amana, Iowa facility. *Id*. ¶ 8. In addition to Whirlpool, PIC also provided quality assurance services to Whirlpool's suppliers at the Amana facility. *Id*. ¶¶ 9-10. PIC contracted directly with Whirlpool's suppliers, and the suppliers paid PIC directly for the costs associated with PIC's quality assurance labor. *Id*. ¶ 11.

Employees for PIC perform their work onsite at the location of the company that contracts for PIC's services. *Id*. ¶ 6. Whirlpool has no involvement in PIC's hiring or

5

personnel decisions. *Id*. ¶ 13. Whirlpool and PIC do not share employees and do not have any overlapping management. *Id*. ¶ 12. Whirlpool does not pay PIC employees. *Id*. ¶ 14. PIC employs supervisors who oversee PIC employees at the locations where PIC provides its services. *Id*. ¶ 7.

### B.  *Easterday's employment with PIC*

On May 24, 2016, Easterday was hired by PIC to work as a Quality Inspector. *Id*. ¶ 15. Prior to being hired by PIC, Easterday submitted an application to PIC and participated in an interview with PIC. *Id*. From May 2016 through September 2016, Easterday was assigned by PIC to perform quality assurance work at Whirlpool's Amana facility, as ordered by either Whirlpool or Whirlpool's suppliers. *Id*. ¶ 16. Easterday's primary job was to inspect refrigerators. *Id*. ¶ 17. Each day, Easterday clocked in and out from work on computers provided by PIC. *Id*. ¶ 18. She received her daily job assignments from her PIC supervisors. *Id*. Easterday's supervisors were Cathy Samaniego and Erin Krewson, both PIC employees. *Id*. ¶ 2. While employed by PIC, Easterday was paid only by PIC. *Id*. ¶ 20. Additionally, if Easterday was running late for work or needed a day off from work, she would inform her PIC supervisor. *Id*. ¶ 22. Had Easterday remained employed with PIC, she would have been eligible for benefits provided by PIC. *Id*. ¶ 21. No Whirlpool employee had authority to hire, terminate or discipline any PIC employee, including Easterday. *Id*. ¶ 25. Similarly, no Whirlpool employee had the authority to dictate the work schedule of any PIC employee. *Id*.

### C.  *Rick Raue's employment with Whirlpool*

Rick Raue began working for Whirlpool at the Amana facility in 1993. *Id*. ¶ 26. At all times relevant to this lawsuit, Raue worked as a "Production Specialist," including the time period that Easterday was assigned by PIC to work at Whirlpool's Amana facility. *Id*. As a Production Specialist, Raue's primary job is to transport refrigerator

6

units throughout the Amana facility using heavy transportation equipment and to facilitate the shipment of units to other locations. *Id*. ¶ 31. When not performing his primary job, Raue's secondary responsibility is to deliver Whirlpool products to third-party quality assurance workers, so that these workers can perform their work of inspecting and reworking the delivered products. *Id*. ¶ 33. When Raue is not performing his primary or secondary jobs, his default job is to perform work on the assembly line. *Id*. ¶ 35. Raue has no authority to hire, discipline or terminate any other Whirlpool employee. *Id*. ¶ 30. Similarly, Raue had no authority to hire, discipline or terminate PIC employees, including Easterday. *Id*. ¶ 74. Additionally, Raue has no authority to direct the work of any other Whirlpool employee, and no Whirlpool employees report to him. *Id*. However, in the course of delivering products to quality assurance workers, Raue sometimes demonstrates to the quality assurance workers how best to inspect and/or rework a particular product. *Id*. ¶ 34.

### D. *Easterday's resignation*

On September 12, 2016, prior to the September 15, 2016 interaction with Raue that prompted this lawsuit, Easterday gave two-weeks' notice to her PIC supervisor, intending to resign her employment with PIC. *Id*. ¶ 36. Easterday did not notify anyone at Whirlpool that she intended to resign her employment with PIC. *Id*. ¶ 37. Easterday stated that she intended to finish medical administration school and did not have another job lined up. *Id*. ¶ 38. At some point between September 12, 2016 and September 15, 2016, Easterday told her PIC supervisor that she was rethinking her resignation. Easterday's "Statement of Material Facts Rendering Summary Judgment Inappropriate" ("SOMF") (docket no. 33-3) ¶ 25.

### E. *Raue's alleged harassment of Easterday*

On September 15, 2016, Raue delivered pallets of wire harness to PIC employees, including Easterday, for rework. SUMF ¶ 39. Easterday alleges the following interaction took place between herself, Raue and another individual:[1]

> [Raue] had just walked in and one of them [(the other individuals in the area)] had said, "[Raue] do you have any chew?"
>
> [Raue] says, "No, I don't."
>
> Or, "Do you chew?"
>
> And [Raue] said, "No, I don't."
>
> And I said, "But I do. . . ."
>
> And they said, "You do?" And Chad I believe says, "Can I have a dip?"
>
> I says, "No, I'm fresh out."
>
> And we all had a laugh and went back to work and didn't even make eye contact with anybody, didn't even turn back to holler at them and stayed facing the wall. And next thing I know I'm still seated, continuing my job and [Raue] comes up to my left side. . . .
>
> [Raue] brushes my left arm[.] . . . And he grabs his waist of his pants and his belt, pulls them out, shakes them up and down and says, "If you want something to chew on, here it is."

---

[1] From Easterday's deposition testimony, it appears likely that there was more than one individual present in the encounter between Raue and Easterday, including individuals named Tony and Chad, and other individuals who Easterday could not remember. *See* Whirlpool's "Appendix in Support of Defendant's Motion for Summary Judgment" ("Whirlpool's Appendix") (docket no. 30-3) at 61.

*Id.* ¶ 40; Whirlpool's Appendix at 61-63. Easterday reported the incident to her PIC supervisor, who asked Easterday to write a statement concerning the incident. SUMF ¶ 41. While writing the statement, Raue approached Easterday and apologized, stating that he was "sorry" and "I didn't mean what I said. I didn't mean anything by it." *Id.* ¶ 42; Whirlpool's Appendix at 65. Easterday did not report the incident to anyone at Whirlpool. SUMF ¶ 43. However, on the day after the incident involving Raue, Easterday's supervisors, Krewson and Samaniego, reported the incident to Whirlpool's Amana facility Human Resources Department.[2] SOMF ¶ 19.

After writing her statement, Easterday left work for the remainder of the day. SUMF ¶ 45. On September 16, 2016, the day after the incident with Raue, Easterday informed a PIC supervisor, via text message, that she did not intend to return to work. *Id.* ¶ 46. Easterday never returned to PIC after she left on September 15, 2016. *Id.* ¶ 47. Whirlpool investigated the incident and concluded that Raue likely made the comment on September 15, 2016, which Easterday alleged he made. *Id.* ¶ 49. However, Raue was not disciplined for the incident because Whirlpool did not complete its investigation within the time period that Raue could have been disciplined under his union agreement. *Id.* Following her resignation, Easterday made a claim for unemployment benefits, naming PIC as her employer. *Id.* ¶ 50.

### F. *Other allegations of prior incidents involving Raue*

Easterday alleges that, in May 2016, Raue looked her "up and down" and said to her, "Honey, you have everything you need." *Id.* ¶ 54. Easterday never reported Raue's alleged comment to anyone at PIC or Whirlpool. *Id.* Easterday also identified an unspecified comment, without any recollection of what the comment was or what it was

---

[2] Whirlpool notes that Krewson and Samaniego reported the incident on September 16, 2016, after Easterday's resignation had taken effect. SUMF ¶ 48.

9

about, other than in her opinion, it was sexually harassing in nature. *Id*. ¶ 55. Easterday did not report the unspecified comment to anyone. *Id*. ¶ 56. Easterday also alleges that Raue made "sexually-related" comments to other females in the workplace, including comments about what people were wearing or whether they picked anyone up when going out over the weekend. *Id*. ¶ 57. Easterday never reported Raue's alleged "sexually-related" comments to other female workers to PIC or Whirlpool. *Id*. ¶ 58. Raue never did anything that Easterday thought was "offensive or inappropriate," except for making inappropriate comments. *Id*. ¶ 59.

Easterday's PIC supervisor, Cathy Samaniego, never received a complaint about Raue, except for Easterday's September 15, 2016 complaint. *Id*. ¶ 65. Samaniego never saw Raue behave inappropriately or make sexually suggestive comments to female employees. *Id*. ¶ 66. Easterday's other PIC supervisor, Erin Krewson, never knew Raue to engage in any inappropriate behavior in the workplace. *Id*. ¶ 67. Krewson also never received a complaint related to inappropriate behavior by Raue. *Id*. ¶ 68. Except for Easterday's September 15, 2016 complaint, neither Samaniego nor Krewson ever reported to Whirlpool that Raue acted inappropriately around female employees in the workplace. *Id*. ¶ 69.

Outside of Easterday's September 15, 2016 complaint, Whirlpool's Human Resources Department has never received a complaint about Raue. *Id*. ¶ 70. Raue's supervisors have never received any complaints regarding Raue's behavior in the workplace. *Id*. ¶ 71.

### G. *Raue was not Easterday's supervisor*

Raue's interaction with PIC employees was limited to providing PIC employees with an initial demonstration of how a job was to be completed and dropping-off/picking-up Whirlpool products. *Id*. ¶ 73. Easterday agreed that her daily interactions with Raue consisted of Raue demonstrating how to complete a task or supplying her with additional

10

product. *Id*. ¶ 78. Raue had no authority to hire, fire, discipline or control the work of PIC employees, including Easterday. *Id*. ¶ 74. Krewson did not consider Raue to be a supervisor at Whirlpool. *Id*. ¶ 75. Easterday's co-worker, Tony Melton, knew Raue was not his supervisor while he was employed by PIC at the Whirlpool Amana facility. *Id*. ¶ 76.

## VI. ANALYSIS

### A. Parties' Arguments

Whirlpool argues that it is entitled to summary judgment on Easterday's sexual harassment claim for two reasons. First, Whirlpool argues that it was not Easterday's employer, and therefore, it cannot be held liable under the ICRA. *See generally* Whirlpool's Brief in Support of Motion for Summary Judgment ("Whirlpool's Brief") (docket no. 30-1) at 5-10. Second, Whirlpool argues that Easterday is unable to establish her claim of sexual harassment. *See id*. at 11. Specifically, Whirlpool argues that the alleged harassment was not so severe or pervasive that it altered a term, condition or privilege of Easterday's employment. *See generally id*. at 11-16.

Easterday responds that Whirlpool was her joint employer, and therefore, is liable under the ICRA. *See generally* Easterday's Brief in Support of Resistance to Defendant's Motion for Summary Judgment ("Easterday's Brief") (docket no. 33-1) at 4-8. Further, Easterday argues that (1) Raue's harassing conduct was sufficiently severe and pervasive; and (2) Whirlpool was aware of Raue's conduct and failed to take remedial action. *See generally id*. at 9-13.

### B. The Parties Have Identified No Issues of Material Fact

This Motion can be resolved based on the issue of whether Easterday is able to establish her claim of hostile work environment/sexual harassment under the ICRA. Therefore, the court makes no legal determination on the issue of whether Whirlpool was Easterday's joint employer and presumes for purposes of this Motion only, that Whirlpool

was Easterday's joint employer; however, both parties agree that Raue was not Easterday's superior in any event.

Iowa Code section 216.6 makes the creation of a sexually hostile work environment illegal. § 216.6(1) provides in pertinent part:

> It shall be an unfair or discriminatory practice for any:
>
> a. Person to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the . . . sex . . . of such applicant or employee, unless based upon the nature of the occupation.

*Id*. In order to establish a hostile work environment claim under the ICRA, a plaintiff must show: "(1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment." *Haskenhoff v. Homeland Energy Solutions, LLC*, 897 N.W.2d 553, 571 (Iowa 2017) (quoting *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 746 (Iowa 2006)). "Harassment affects a term, condition, or privilege of employment 'when the workplace is permeated with "discriminatory intimidation, ridicule, and insult" . . . "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" *Haskenhoff*, 897 N.W.2d at 571 (quoting *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.d 733, 743 (Iowa 2003), in turn quoting *Harris Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993))).

Recently, in *State v. Watkins*, 914 N.W.2d 827 (Iowa 2018), a case involving the challenge of a state district court order removing an attorney from his elected position as a state county attorney, the Iowa Supreme Court reviewed the law in Iowa pertaining to sexual harassment in the workplace. *Id*. at 831, 843-44. The Iowa Supreme Court explained that "'A hostile work environment is a cumulative phenomenon,' and a series

of individual episodes of inappropriate behavior eventually can amount to a hostile environment." *Id*. at 843 (quoting *Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446, 470), in turn quoting *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010))). "'A recurring point in [the jurisprudence governing sexually hostile work environments] is that "simple teasing," offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the' employment conditions to create an abusive work environment." *Watkins*, 914 N.W.2d at 843 (alteration in original) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). "The standards governing a hostile work environment are intended to 'filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Watkins*, 914 N.W.2d at 843-44 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006), in turn quoting *Faragher*, 524 U.S. at 788))). Thus, a plaintiff "must establish that 'he or she subjectively perceived the conduct as abusive, [and] that a reasonable person would also find the conduct to be abusive or hostile.'" *Watkins*, 914 N.W.2d at 844 (quoting *Farmland Foods*, 672 N.W.2d at 744). In order to determine whether a reasonable person would find the challenged conduct to be abusive or hostile, all circumstances must be examined, including: "(1) the frequency of the conduct[;] (2) the severity of the conduct[;] (3) whether the conduct was physically threatening or humiliating or whether it was merely offensive[;] and (4) whether the conduct unreasonably interfered with the employee's job performance." *Watkins*, 914 N.W.2d at 844 (quoting *Farmland Foods*, 672 N.W.2d at 744-45). "These factors and circumstances must disclose that the conduct was severe enough to amount to an alteration of the terms or conditions of employment. Thus, hostile-work-environment claims by their nature involve ongoing and repeated

conduct, not isolated events." *Watkins*, 914 N.W.2d at 844 (quoting *Farmland Foods*, 672 N.W.2d at 745).

While not binding, Iowa courts "have traditionally looked to federal law for guidance" in interpreting the ICRA, "[b]ecause the ICRA is modeled after . . . federal legislation." *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003); *see also McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) ("Because the ICRA is in part modeled after Title VII, we have traditionally looked to federal law for guidance in interpreting it"); *Watkins*, 914 N.W.2d at 843-44 (relying on federal law for interpreting a sexual harassment claim under the ICRA); *Haskenhoff*, 897 N.W.2d at 571-75 (same); *Simon Seeding & Sod*, 895 N.W.2d at 468-71 (same); *Wright v. Ross Holdings, LLC*, No. 14-1106, 2015 WL 1848534, at *5-*6 (Ct. App. Iowa Apr. 22, 2015) (same). In determining whether a plaintiff is able to establish the fourth element of a hostile work environment claim under the ICRA, that is, whether the harassment affected a term, condition or privilege of employment, and bearing in mind that harassment affects a term, condition or privilege of employment, when it is sufficiently severe or pervasive to create an abusive working environment, *see Haskenhoff*, 897 N.W.2d at 571, the court finds that the Eighth Circuit case *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir. 2002) is instructive. *See also Wright*, 2015 WL 1848534, at *5 (relying on *Duncan* for interpreting severity of harassment in a sexual harassment claim brought under the ICRA).

In *Duncan*, the Eighth Circuit reversed a jury's award of damages for the plaintiff on her sexual harassment claim. 300 F.3d at 930-31. Two weeks after the plaintiff was hired, her supervisor propositioned her to have a relationship with him. *Id*. at 931. The plaintiff alleged that the supervisor's manner toward her became hostile after she declined his advance. *Id*. The plaintiff testified to numerous incidents of her supervisor's inappropriate behavior:

14

> [The supervisor] directed [the plaintiff] to create a training document for him on his computer because it was the only computer with the necessary software. The screen saver that [the supervisor] had selected to use on his computer was a picture of a naked woman. [The plaintiff] testified to four or five occasions when [the supervisor] would unnecessarily touch her hand when she handed him the telephone. In addition, [the supervisor] had a planter in his office that was shaped like a slouched man wearing a sombrero. The planter had a hole in the front of the man's pants that allowed for a cactus to protrude. . . . [The supervisor] also kept a child's pacifier that was shaped like a penis in his office that he occasionally showed to his coworkers and specifically to [the plaintiff] on two occasions.
>
> In 1995, [the plaintiff] requested a pay increase and told [the supervisor] that she would like to be considered for an illustrator's position. [The supervisor] said that she would have to prove her artistic ability by drawing his planter. . . .
>
> Additionally, in 1995, [the supervisor] . . . created a 'recruitment' poster that was posted on a bulletin board in the high-tech area. The poster portrayed [the plaintiff] as the president and CEO of the Man Hater's Club of America. . . .
>
> On May 5, 1997, [the supervisor] ask [the plaintiff] to type a draft of the beliefs of the 'He-Men Women Hater's Club.' The beliefs included the following:
>
> - Constitutional Amendment, the 19th, giving women the right to vote should be repealed. Real He-Men indulge in a lifestyle of cursing, using tools, handling guns, driving trucks, hunting, and of course, drinking beer. . . .
> - Women are the cause of 99.9 per cent of stress in men.
> - Sperm has a right to live.
> - All great chiefs of the world are men.
> - Prostitution should be legalized.

*Id.* at 931-32. The Eighth Circuit determined that the plaintiff's alleged harassment was not so severe or pervasive as to alter a term, condition, or privilege of her employment. *Id.* at 934. Specifically, the Eighth Circuit found that the evidence presented at the trial

15

showed that the plaintiff was upset and embarrassed by the posting of the derogatory poster, and was disturbed by the supervisor's advances and inappropriate behavior, but she failed to show that "these occurrences in the aggregate were so severe and extreme that a reasonable person would find that the terms and conditions of [her] employment had been altered. *Id*. The Eighth Circuit concluded that:

> [The supervisor's] actions were boorish, chauvinistic, and decidedly immature, but we cannot say they created an objectively hostile work environment permeated with sexual harassment. Construing the evidence in the light most favorable to [the plaintiff], she presented evidence of four categories of harassing conduct based on her sex: a single request for a relationship which was not repeated when she rebuffed it, four or five isolated incidents of [the supervisor] briefly touching her hand, a request to draw a planter, and teasing in the form of a poster and beliefs for an imaginary club. It is apparent that these incidents made [the plaintiff] uncomfortable, but they do not meet the standard necessary for actionable sexual harassment.

*Id*. at 935.

Considering all circumstances, including the four factors outlined in *Watkins*, 914 N.W.2d at 844, and viewing the record in the light most favorable to Easterday, the court finds that a reasonable person would not find the alleged harassing conduct to be so severe or pervasive that it would alter a term, condition, or privilege of Easterday's employment. First, the alleged conduct was infrequent. Easterday alleges only two specific incidents involving Raue. One incident occurred in May 2016, involving Raue allegedly looking Easterday "up and down" and saying, "Honey, you have everything you need." SUMF ¶ 54. Easterday did not report this comment to anyone. The other incident occurred in September 2016, where Raue allegedly grabbed the waist of his pants and belt and shook them up and down, saying to Easterday that, "If you want something to chew on, here it is." *Id*. ¶ 40; Appendix at 61-63. Easterday also identified an unspecified comment by Raue that she alleges was sexually harassing. SUMF ¶ 55. However, Easterday had no

16

recollection of what the comment was or what it was about. *Id*. Easterday did not report the alleged unspecified comment to anyone. *Id*. ¶ 56. Easterday also alleges that Raue made "sexually-related" comments to other females in the workplace, but never reported these alleged comments to anyone, and there is no evidence that anyone ever complained about Raue acting inappropriately toward women in the workplace. *Id*. ¶¶ 57-58, 65-71.

Second, these alleged comments, while offensive, were not physically threatening or humiliating. Third, there is no evidence that any of these comments interfered with Easterday's job performance. Indeed, Easterday did not report two of the alleged incidents and had resigned her employment prior to the September 15, 2016 incident.

Finally, considering the alleged comments in light of *Duncan* and its progeny, Raue's alleged comments do not rise to the level of actionable hostile work environment sexual harassment. *See Duncan*, 300 F.3d at 935; *see also McMiller v. Metro*, 738 F.3d 185, 188 (8th Cir. 2013) (finding that a male supervisor who kissed a female plaintiff on two occasions, placed his arms around the plaintiff or attempted to do so three times and requested that the plaintiff remove an ingrown hair from the supervisor's chin did not rise to the level of severe or pervasive conduct which altered a term, condition, or privilege of the plaintiff's employment); *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858, 863 (8th Cir. 2009) (finding that a manager's conduct of rubbing the plaintiff's shoulders and back, calling her "baby doll," insinuating that she could go farther in the company if she got along with him and accusing her of not wanting to be "one of my girls" to not be sufficiently severe, pervasive or demeaning to have altered a term, condition or privilege of her employment); *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 551-52 (8th Cir. 2007) (finding that repeated comments about plaintiff's body by two co-workers, repeated requests for dates by two co-workers and two incidents of touching (hair and pant leg) by a co-worker did not amount to severe or pervasive conduct which altered a term, condition or privilege of her employment);

17

*LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1100-03 (8th Cir. 2005) (finding that the unwelcome sexual advances of a priest serving on the board of a non-profit organization who employed the plaintiff, which consisted of the priest asking the plaintiff to watch pornographic movies with him and "jerk off" to relieve stress, suggesting a second time that watching pornographic movies with him would advance the plaintiff's career in the non-profit organization, kissing the plaintiff, grabbing the plaintiff's buttocks, brushing the plaintiff's crotch area and gripping the plaintiff's thigh under a table during a meeting at the non-profit organization were not so severe or pervasive as to "poison" the plaintiff's work environment); *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 760 (8th Cir. 2003) (concluding that the district court erred in finding a triable issue for the jury on the plaintiff's hostile work environment claim, where the harassing conduct consisted of belittling and sexist remarks on an almost daily basis); *Wright*, 2015 WL 1848534, at *5 (Iowa Court of Appeals relying on *Duncan*, *Vajdl* and other Eighth Circuit cases for determining whether sexually harassing conduct was severe, and finding that conduct involving "sexually-fueled conversations, minor touching, and requests for a relationship . . . conduct . . . similar to *Duncan* and *Vajdl* and thus, not so severe or pervasive as to affect a term or condition of [the plaintiff's] employment").

Easterday is unable to establish the fourth element of a hostile work environment/sexual harassment claim under the ICRA. Accordingly, the court finds that there are no material issues of fact and Whirlpool is entitled to judgment as a matter of law.

## VII. CONCLUSION

In light of the foregoing, Whirlpool's Motion for Summary Judgment (docket no. 30) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Whirlpool Corporation and against Plaintiff Sherin Easterday. The Clerk of

18

Court is **DIRECTED** to **CLOSE THIS CASE**. The Final Pretrial Conference scheduled for May 7, 2020 is **CANCELLED** and the trial date of June 8, 2020 is **RELEASED**.

    **IT IS SO ORDERED**.

    **DATED** this 30th day of March, 2020.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA